1
              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF MARYLAND
2


3


4    UNITED STATES OF AMERICA,        :
                                      :
5                   Plaintiff         :
                                      :    Criminal Case Nos.
6          v.                         :    8:00-cr-00605-PJM
                                      :    8:00-cr-00373-PJM
7    ADETUBOKUN A. ADESIOYE,          :
                                      :
8                                     :
                    Defendant         :    SENTENCING HEARING
9                                     :
     ..............................   :    ........................
10

11                    Transcript of Proceedings
            Before the Honorable Judge Peter J. Messitte
12                    Thursday, December 10, 2020
                        Conducted Virtually
13

14
       For the United States:
15     Jennifer L. Wine, Esq.

16

17     For the Defendant:
       Richard S. Basile, Esq.
18

19

20

21

22

23
                    Rebecca Stonestreet, RPR, CRR
24                  Federal Official Court Reporter
                       6500 Cherrywood Lane
25                     Greenbelt, Maryland

2

**P R O C E E D I N G S**

1                    **P R O C E E D I N G S**

2          COURTROOM CLERK:  May I have your attention, please.

3    The United States District Court for the District of Maryland is

4    now in session, the Honorable Peter J. Messitte presiding.  The

5    matters now pending before the court are criminal case numbers

6    PJM-00-0373 and PJM-00-0605, the United States of America versus

7    Adesioye.  The matters now come before the court for a

8    sentencing in each case.

9          THE COURT:  All right.  I see you, Mr. Basile; I see

10   Ms. Wine; I see the defendant.  There are other individuals I

11   don't recognize.  I would like them to identify themselves.

12   Mr. McCann, who are you?

13         MR. MCCANN:  Yes, Your Honor, good afternoon.  I'm a

14   special agent with the FBI.  I've taken over this case from

15   Special Agent Russell Stoner, who had the previously taken over

16   the case from --

17         THE COURT:  All right.  Mr. Encarnacion, I see you from

18   probation.

19         Mr. Victory, can't read the last name, who are you?

20         MR. OLUWASEGUN:  I am a witness in the case.  I've been

21   called to testify.

22         THE COURT:  Very good.  Well, it seems to me that at

23   this point I need to go through the specific objections to the

24   PSR.  So, Mr. Basile, I'm going to do that now because I have to

25   make specific findings.  So I know you have several, and let's

1     just go at them one by one.  Go ahead.

2           MR. BASILE:  Very well, Your Honor.  First, they are

3     proposing to do a four-level increase because of the defendant

4     was a leader or organizer of a criminal scheme that involved

5     five or more persons, and we take issue with his

6     characterization as being a leader or organizer or manager.  And

7     we understand that he signed on his factual information and what

8     he pleaded to in the plea agreement, but that plea agreement

9     does not say what he did that would constitute being a leader or

10    an organizer or a manager.  It says he just got account

11    information from a teller, he then did transactions, he paid the

12    teller, and that essentially was it.  There was nothing about

13    him splitting profits with anybody, about him supervising

14    anybody, about him being in any hierarchy.

15          And his contention, if he were to testify, is that he

16    was simply doing transactions along with other people, and that

17    they were not organized with him or taking orders from him.  He

18    was in no way acting as a supervisor or person giving orders to

19    advance the scheme.

20          THE COURT:  Does the government want to respond,

21    Ms. Wine?

22          MS. WINE:  Yes.  As set out in our sentencing memo,

23    Your Honor, we do believe that the four-level enhancement for

24    being an organizer or a leader under Sentencing

25    Guideline 3B1.1(a) is appropriate here.  The facts that the

1    defendant agreed to in connection with his plea in the first --

2    to Count 1 of the first indictment, 00-373, make clear that his

3    co-defendant, Dawn Hall, provided Mr. Adesioye with information

4    about Crestar bank accounts.  She then arranged for other

5    tellers to issue the fraudulent bank checks on accounts of

6    victims, and then gave the checks to Mr. Adesioye and his

7    accomplices.  In exchange for participating in the scheme,

8    Ms. Hall received payments from Mr. Adesioye and she distributed

9    those payments on to the other co-defendants.

10          We believe that those facts, the facts that he was the

11   one receiving the checks, the one paying out the other

12   co-defendants, we believe that that does --

13          (Unknown voice on conference.)

14          THE COURT:  We're getting some interference.  Who are

15   the people on the public line?  Are there people witnessing this

16   or what?

17          (Off the record technical discussion.)

18          THE COURT:  Go ahead.  Anything further, Ms. Wine, on

19   this point?

20          MS. WINE:  Your Honor, we believe that the facts that

21   are established in the plea outline that the defendant was

22   acting as an organizer or leader under these circumstances.

23          For the second indictment, where he also pled to the

24   Count 1 charging bank fraud, in which he was the only defendant,

25   it further outlines that he was the leader of that conspiracy as

1    well -- or, sorry, that he was the leader of that criminal

2    conduct as well.  He obtained counterfeit checks that were drawn

3    on financial institutions with forged signatures, according to

4    the stipulated facts; he then arranged for those to be deposited

5    into the bank accounts of other persons who agreed to allow

6    Mr. Adesioye to use their bank accounts; and then once they had

7    been deposited, the defendant arranged to withdraw those funds

8    from the bank accounts.

9          We believe it is clear that given the facts that he

10   admitted to in the plea agreement, that he was the organizer or

11   leader.

12         Further, in response to the fact that the defendant

13   raises an argument that Ms. Hall should be considered the

14   organizer or leader, Application Note 2 to the guideline makes

15   clear that there can, of course, be more than one person who

16   qualifies as a leader or organizer.  So the fact that she had

17   some role does not necessarily abrogate the fact that the

18   defendant here was acting as the organizer.

19         THE COURT:  All right.  Mr. Basile?

20         MR. BASILE:  Your Honor, I submit on the facts that we

21   agreed to in the plea agreement.  There's nothing to indicate

22   who was doing what with whom, and the burden is on the

23   government to prove that.

24         And one additional point, Your Honor.  In Note

25   Number 4 -- and I'm talking about application note 3B1.1, and

1    that note says that if he was a manager or supervisor, there's a

2    three-level increase; if he was an organizer or leader, it's a

3    four-level increase.  Nothing in the facts showed that he

4    organized or led this.

5              And if you look at Note 4, supposedly the factors that

6    the Court should consider, it says, are the exercise of

7    decision-making authority; there's nothing in the facts about

8    that.  The nature of participation in the commission of the

9    offense; well, we have that in the facts, and that shows that he

10   was a participant.  No question about it.  The recruitment of

11   accomplices; there's nothing in the facts that show that he

12   recruited accomplices.  The claimed right to a larger share of

13   the fruits of the crime; there's nothing that indicates what his

14   share of the fruits of the crime were, or that he claimed it.

15   The degree of participation and planning or organizing the

16   offense; there's nothing about a degree.  It shows that he asked

17   somebody for information, but the government, I think, has to

18   prove more than that.

19             The nature and scope of the illegal activity; what you

20   have is a lot of transactions going on, but in the factual

21   situation, there isn't even facts alleged as to specifically

22   what things he did.  It goes on and says the defendants did

23   this, this, this, and that; what his role was is not set out.

24   And the last factor is the degree of control and authority

25   exercised over others.  There's no allegations as to what the

1    degree of his authority or control was.  And that's the

2    government's burden, Your Honor.

3           THE COURT:  Can you hold on a second?  My guideline

4    manual is under the...okay.  Anything further on that?  Let's

5    move on.  Ms. Wine, anything further?

6           MR. BASILE:  That's all from me, Your Honor.

7           MS. WINE:  Your Honor, just one further point on that

8    one.  The Stipulation of Facts does specifically refer to the

9    defendant's recruitment of a co-conspirator.  On the second page

10   of the Statement of Facts, it notes that in July of 2000,

11   Adesioye held a conversation with Dawn Hall in which he asked

12   her to arrange another bank teller to issue fraudulent checks.

13   Following that, pursuant to arrangements made by Adesioye, this

14   additional co-conspirator, Ogunyankin, picked up fraudulent

15   checks.

16          So I don't know what the defendant is referring to here

17   that there is no admitted-to conduct that the defendant

18   recruited.  The language is clear in the stipulated facts.

19          THE COURT:  The court addresses this requested

20   objection to the presentence report.  It is an objection that

21   goes to...hold on one minute.  Is it Paragraph 47?  I'm sorry, I

22   need to find the specific calculation here.

23          MS. WINE:  Your Honor, if you're looking at the PSR,

24   you're correct that it is --

25          THE COURT:  With respect to Paragraph 47, probation has

1    recommended an adjustment for the role in the offense, that he

2    conspired with five or more individuals to obtain these

3    counterfeit checks, and that he was a leader and organizer of

4    the transaction.

5         First of all, we'll start with the proposition that

6    there can be more than one leader or organizer.  That sort of

7    takes care of whatever role Ms. Hall might have.  The question

8    is, what did the defendant do?  In the court's review of the

9    facts in the plea agreement, it says that in each case the

10   defendant was involved with co-defendants Hall, Raphael, Taiwo,

11   and Ogunyankin in the fraud of a financial institution through

12   the use of fraudulent checks.  In 00-373 it indicates

13   specifically that Hall provided information to the defendant

14   about Crestar bank accounts, arranged for tellers to issue

15   checks on the accounts to Adesioye and his co-conspirators, who

16   all received payments from Adesioye and passed on payments to

17   other co-defendants.  And then asked Hall to arrange for another

18   bank teller, Ogunyankin, to issue fraudulent checks.  It says

19   Hall was an organizer.

20        The fact of the matter is that the facts that are in

21   the plea agreement do justify a finding that the defendant was a

22   leader and organizer.  The defendant's request to strike the

23   four-level enhancement is denied.

24        Next objection, Mr. Basile?

25        MR. BASILE:  Your Honor, the next objection is to the

1    finding of obstructing or impeding the administration of

2    justice.  And the (technical interference) --

3              THE COURT:  Go ahead.

4              MR. BASILE:  3C1.1 deals with obstructing or impeding

5    the administration of justice, and that requires that the

6    defendant willfully obstructed or impeded, or attempted to

7    obstruct or impede the administration of justice.  The

8    obstructive conduct (technical interference) any relevant

9    conduct.

10             Now, the allegation here is -- in the factual

11   agreement, the allegation was that in some time of July of

12   2001 -- or excuse me, July of 2000, two days before his arrest,

13   he had (technical interference) --

14             COURTROOM CLERK:  Hold on.  Hold on.  I am reaching out

15   to Mike Mani.  We are supposed to be able to mute the defendant

16   and ask the defendant to unmute.  That is not happening in this

17   case, so hold on just a moment.  We're getting way too much

18   feedback from the facility.  I apologize.

19             (Off the record technical discussion.)

20             COURTROOM CLERK:  Your Honor, I have muted

21   Mr. Adesioye.

22             THE COURT:  He's able to hear, however?

23             COURTROOM CLERK:  Yes.

24             THE COURT:  Mr. Basile, continue, please.

25             MR. BASILE:  All right, Your Honor.  3C1.1 deals with

1   obstruction or impeding with the administration of justice, and

2   the original allegation -- actually, there's two allegations now

3   of obstruction.  The original one had to do with the fact that

4   in July of 2001, a couple of days before his arrest, he had told

5   a co-defendant to destroy some checks that he apparently had

6   been involved with, and two days later he was arrested.

7           And it's our contention, Your Honor -- and especially

8   if you look at the application notes on 3C1.1, it talks about

9   material evidence; there has to be a material action that has to

10  materially affect the prosecution or the arrest or the progress

11  of the case.  It's our contention, Your Honor, that whatever he

12  told Ms. Ogunyankin made no difference.  They had been

13  investigating him for a year, they had all the evidence on him

14  that they needed.

15          Two days after he gave this advice to Mrs. Ogunyankin,

16  he was arrested, he was charged, he pled guilty.  Whatever he

17  told Ms. Ogunyankin was not material to the investigation, did

18  not materially interfere with the investigation, or disrupt the

19  investigation.  And that being the case, if it's not material,

20  the enhancement should not apply.

21          If you want me to address --

22          THE COURT:  Stop on that one, because I'll have more to

23  say about his fleeing sentencing when we get there.

24          Ms. Wine, why don't you respond to the suggestion that

25  the fact that he may have told a witness to destroy checks

1    somehow is not obstruction of justice.

2         MS. WINE:  Your Honor, Application Note 4 to Sentencing

3    Guideline 3C1.1 makes clear that the adjustment applies to,

4    quote, "directing or procuring another person to destroy or

5    conceal evidence that is material to an official investigation

6    or a judicial proceeding."

7         It sounds to me like what the defendant is contesting

8    here is whether or not the evidence was material.  What we're

9    dealing with, as set forth in the stipulated facts, is a scheme

10   whereby fraudulent checks were obtained and provided to the

11   defendant; he directed a co-conspirator, once learning that she

12   had been arrested, to not only destroy the checks that are the

13   subject of the entire offense, but he further advised her to

14   tell authorities that she did not know the person who asked her

15   to get them.  And that's on page 11 of the plea.  It's page 10

16   carrying over to page 11.

17        I think that the defendant here misconstrues what is in

18   fact material.  It does not matter that the defendant was

19   arrested a few days later, it does not matter that the

20   government had enough evidence to charge him.  The government

21   could have used additional evidence to supersede.

22        Further, it says, "evidence that is material to an

23   official investigation or a judicial proceeding."  Clearly the

24   fraudulent checks and the false testimony that he was trying to

25   elicit from his co-conspirator would have been material to this

1   judicial proceeding in which he was charged as part of a

2   conspiracy involving fraudulent checks.

3          THE COURT:  All right.  Let me go to the presentence

4   report specifically where that enhancement is indicated.

5          MS. WINE:  And that's Paragraph 48, Your Honor.

6          THE COURT:  All right.  Let's look at Paragraph 48.  I

7   need to find the computation.

8          All right.  The objection is made to the adjustment for

9   obstruction of justice at Paragraph 48, a two-level enhancement.

10  The suggestion of the government is that the defendant attempted

11  to obstruct or impede the investigation by directing

12  Ms. Ogunyankin to tear apart the checks; also to tell

13  authorities that she did not know the person who asked her to

14  get them.

15         The defense doesn't argue, as to that, that it didn't

16  happen.  He's saying it's not material.  Confusion about

17  materiality.  It may not be necessary to convict him, but it's

18  material insofar if they want to pile on any evidence and make

19  it 100 percent powerful, they can do it.  If they have a

20  90 percent case, fine.  This particular material evidence,

21  would, it seems to me, also go to the issue of guilt.  The

22  request to knock out those two points, at least as to this

23  phase, is denied.

24         Now, the further suggestion for the two-level

25  enhancement has to do with the defendant's flight prior to

1    sentencing.  And are you objecting to that, Mr. Basile?  Maybe

2    I'm not understanding.

3          MR. BASILE:  Well, I think, for the record, we probably

4    ought to discuss it, in the event that there's an appeal.

5    Normally, as you know, you can't -- if I understand, you can't

6    put together -- if you have two obstructions, you only get the

7    enhancement for one.  You can't put together the two

8    obstructions.  So if you've got --

9          THE COURT:  But they're only calculated as one in the

10   report.  I have some of my own independent concerns about it,

11   which I'll address in a moment.  But I've already established

12   that there is one basis for a two-level enhancement by reason of

13   his talking to the teller and telling her to tear up checks, so

14   that's enough to justify a two-level enhancement.  That's why I

15   wanted to separate these two out.

16         And let me accept the proposition that you're correct,

17   that you're correct.  Let me float to you my concern - and I'll

18   put it right you there - my major concern in this entire case.

19   Here is a man who fled for not one month, not a year, not five,

20   but 14 years.  He says - whether or not I believe him is another

21   matter - he had a pang of conscience three years ago; that is,

22   after he had been gone for 11 years, something of that order.

23   Now, that's a long time to be out of the loop.  And somehow I

24   don't see the guidelines, candidly, even accommodating that.

25   There actually would be a basis for a departure for interference

1    with a government function at that point by fleeing.

2           Clearly someone who has set his own timetable as to

3    when he's prepared to serve his time.  This is not like your

4    normal fellow who goes forward and faces the music.  That's a

5    very, very serious issue in this case.  It will, in my opinion,

6    be the likely basis of an enhancement by the court over and

7    above the sentencing guidelines.

8           So I'm perfectly content at this point to rest on the

9    government's suggestion that contacting the witness was enough

10   to justify the two-level enhancement, and I will address the

11   14-year, more or less, absconding in a separate matter when I

12   come to sentencing.

13          So leave us -- Ms. Wine, I'm not even going to ask you

14   to go forward on the issue of the fleeing, because I really want

15   to address that separately.  It is one of the most troublesome

16   parts of this entire case.  Regardless of whether Mr. Adesioye

17   says he got religion a few years ago or not, it still is a

18   matter that you need to consider.

19          Here's the problem, and you'll hear me say more about

20   this.  Can any defendant who fears -- who's cooperating, can any

21   defendant go forward, disappear for 14 years, and come back and

22   essentially be sentenced with the same sentence he was facing

23   when he fled for 14 years, or 11, or whatever?  My contention is

24   he can't.

25          So I would rather not go forward on the second basis of

1    the enhancement, and just stay with the one issue about it was

2    material whether he contacted the witness.

3              Ms. Wine, do you accept that?

4              MS. WINE:  Yes, Your Honor.

5              THE COURT:  Very well.  Let's go to another

6    enhancement.  We'll come back, when we come to the sentencing in

7    this case, about the nature of the flight; what reasons he gave,

8    what he did or didn't do.

9              What other objections?  Other than that, though, to go

10   back to it, the objection to the adjustment for obstruction of

11   justice under Paragraph 48 is denied.  Next.

12             MR. BASILE:  The enhancement for loss exceeding

13   $350,000.  Your Honor, again, until last night, the only

14   restitution issue in this case was an amount of $98,000.  And

15   that's been the position of the government for the last 14, 15,

16   whatever years.  When you ordered the updated report, again,

17   they came back with a $98,000 restitution which represented the

18   loss.

19             Late last night, or 7 o'clock last night, an email came

20   in to me that I got this morning from counsel saying that there

21   was another substantial loss for Wells Fargo, which is the first

22   I've heard about it.  I don't know exactly how that loss

23   happened or how it was caused or anything about that, and I

24   would ask that that not be considered at this point because

25   we've just been made aware of it.

16

```
 1              What you have in the Stipulation of Facts is that my
 2    client and others were involved in a number of transactions.
 3    There's no factual stipulation as to how much my client got or
 4    attempted to get up to 350,000.  We're happy with the $98,000.
 5    We're not really disputing that part of it.  But the rest of it
 6    is simply a whole series of transactions involving, they say,
 7    more than five people - because he was given an enhancement for
 8    that - and they allege him and several others in the
 9    indictment -- him and several named people in the indictment and
10    others.  Okay?  I don't know who these "and others" are.  That's
11    never come out.
12              We have a small group of people.  Other people are
13    doing other things, and we don't know if they're related to what
14    my client was doing or what my client was attempting to do.  And
15    I don't think the government has met its burden in the
16    Statement of Facts to establish that my client reached $350,000.
17    There are some transactions where no monies were received.  We
18    don't know, like I say, what transactions my client was actually
19    involved in.  We know he was involved in transactions in the
20    $90,000 range because that's in the Statement of Facts that he
21    agreed to.  And then they go --
22              THE COURT:  Wait, wait, wait, wait.  I'm looking at the
23    plea letter in the first case, 00-373.  It says the total value
24    of the checks was $194,209.67; and in the second case, 00-0605,
25    $170,250.  That's clearly more than 350.
```

1          MR. BASILE:  Your Honor, my point is that my client --

2   as to certain of those checks, my client had nothing to do with

3   them.

4          THE COURT:  How do I know that?  How do I know that?

5          MR. BASILE:  Well, it's the government's burden to show

6   that, and they haven't shown it in their

7   Statement of Facts.  They're just saying this whole group of

8   people did this, and others did X, Y, Z, which amounted to

9   $370,000.  Okay?  I don't question that part of it, I question

10  what part my client was a conspirator of or my client did.

11         THE COURT:  All right.  But the conspiracy count alone

12  alleges a value of $194,000.  That's what it says in the plea

13  agreement.

14         MR. BASILE:  Well --

15         THE COURT:  No, no, let me be clear on your argument.

16  You're saying you want to argue now that in the conspiracy he

17  never really was responsible for 194,000.  Start with that, even

18  though it says that in the plea agreement.

19         MR. BASILE:  My argument on that, Your Honor, is that

20  the plea agreement facts do not set forth that he either

21  attempted or in fact did get $370,000.

22         THE COURT:  You don't have to.  In a conspiracy, you

23  don't have to get the money yourself to be responsible, to make

24  restitution.  That's what a conspiracy is.

25         MR. BASILE:  I understand that, Your Honor.  But

1    there's no evidence that he was part of a conspiracy --

2         THE COURT:  Wait, of course there was.  He pled to

3    conspiracy in the first count.  He pled to conspiracy, and the

4    amount of dollars in the conspiracy exceeded $194,000.  Now

5    you're saying he pled the conspiracy but the government has not

6    shown that, what, he used each of those dollars?  He was part of

7    a conspiracy that elicited that amount of money.

8         MR. BASILE:  Well, Your Honor, it's not even that the

9    money was elicited.  98,000 was actually gotten --

10        THE COURT:  98,000 is something else.  I don't know

11   where that came from, frankly.  That's something the government

12   can explain.

13        MR. BASILE:  $98,000 is in the presentence report.

14        THE COURT:  Whatever the presentence report is, that

15   may or may not be correct.

16        Let me hear from the government.  Because it is a

17   little confusing, I confess.  I thought the numbers were clearly

18   over 350 when you add 194, and the second case was a straight

19   bank fraud charge where the number was over 170,000.  That's

20   370,000 right there, plus.  So those numbers to me look right.

21   I don't know where the 98 comes from.

22        Ms. Wine, illuminate, please.

23        MS. WINE:  Yes, Your Honor.  I think what we have here

24   is a confusion on the defendant's part in the difference between

25   loss for purposes of restitution and loss for purposes of the

1    guidelines.  And the guidelines make clear, under Application

2    Note 8 to Guideline 2F1.1, that, "If an intended loss that the

3    defendant was attempting to inflict can be determined, this

4    figure will be used if it is greater that than the actual loss."

5    So for guidelines purposes, intended loss is the correct figure.

6         And as Your Honor correctly pointed out, the defendant

7    has admitted, in connection with Case 00-373, in which he pled

8    to a conspiracy to commit bank fraud, that the total face value

9    of the checks involved in that conspiracy is $194,209.67.

10   Likewise, as Your Honor correctly noted, in Case 00-605, the

11   defendant is the sole defendant.  It is not a conspiracy, it is

12   a straight bank fraud count there, and the total face value of

13   the checks involved was $170,250 in that scheme.  And so those

14   two combined together are more than 350,000.

15        With respect to the arguments that were raised with

16   restitution and the loss to the actual victims, there is the

17   $98,513.80 figure that pertains to the restitution that was in

18   the presentence report for Case 00-373.  In the government's

19   sentencing memorandum we noted on the final page, I believe it

20   is, we noted that we were confirming the amount of the victims'

21   losses in Case 00-605, and specific to the count that the

22   defendant pled to, we have identified that it is the $49,178

23   that is listed for the account of Ave Marshall at First Union

24   Bank.  That is what is charged in Count 1 of the second

25   indictment.

1        But for purposes of the guidelines calculation, it is

2    the intended loss, and as Your Honor correctly noted, it is the

3    face value of the checks that is the appropriate number.  That

4    clearly totals up to over $350,000 here.  So we believe the

5    enhancement for that loss amount is appropriate.

6        THE COURT:  Well, let me go to the paragraph that we're

7    speaking about for the enhancement.  That is what paragraph

8    number?  Anybody have that quickly?

9        MS. WINE:  Yes, Your Honor, it is Paragraph 44 of the

10   PSR.

11       THE COURT:  Let's be clear about that first.  This is

12   not a calculation that's based -- that says the amount of

13   restitution that's due.  That's a separate a separate matter.

14   The fact of the matter is that the defendant pled, by way of

15   conspiracy, to checks -- the intended loss of over 190,000 in

16   0373, and over 170,000 in 0605, which is more than $350,000.  So

17   the guideline 2F1.1(b)(1)(J) does indicate an enhancement of 9.

18       Now, that's not the same as restitution.  Now, the

19   restitution amount did start with -- and I don't know, again, in

20   the plea agreement itself what it says about restitution.  Is

21   there something in the plea agreement that indicates what the

22   amount of restitution is, Ms. Wine?

23       MS. WINE:  No, Your Honor.  It only references the loss

24   amount to the victims.  It does not specify what the actual loss

25   was to the victims.

1          THE COURT:  All right.  Where does that first appear,

2   though?  When does the 98,000 first come in?

3          MS. WINE:  Your Honor, just one second and I can tell

4   you the paragraph.  So in the plea, the restitution agreement is

5   Paragraph I, which is on page 5 of the plea.  The $98,000 figure

6   for the 00-373 first appeared in the presentence report that was

7   initially prepared, and then is repeated in the updated

8   presentence report.  And that is -- so it is in Paragraph 44 as

9   well --

10         THE COURT:  Paragraph 44 of what?

11         MS. WINE:  Of the presentence report.  And then again

12  at page 36 of the presentence report it is referenced --

13         THE COURT:  I know that.  44 really only refers to

14  excess of 350,000, does it not?  I mean, let's not confuse the

15  98,000 there.

16         MS. WINE:  Correct.  I was just referencing that the

17  number was listed there.  But you're correct, Your Honor.

18         THE COURT:  I want to know when the government first

19  told the defendant that $98,000 was due.  Where does that first

20  appear?

21         MS. WINE:  In the first PSR that was prepared,

22  Your Honor.  And I'm looking at that copy.  I believe that was

23  back prepared in 2000.

24         THE COURT:  Do I have this, or is it an amended copy?

25         Mr. Encarnacion, do you know where that appears?

1          MR. ENCARNACION:  Yes, Your Honor, I'm looking right

2     now.  Court's indulgence, let me check.  It might have been in

3     what was added in the paragraphs under 0373.  I'm checking right

4     now.

5          THE COURT:  Added to what?

6          MR. ENCARNACION:  Out of the specific amounts of the

7     checks that were written and deposited into the accounts, I

8     believe we might have added them together to come up with the

9     $98,000.  Let me make sure.

10         THE COURT:  When did that happen, though?  When was the

11    defendant told that it was even 98, as opposed to now it's 147?

12    I mean, the timing is important.  Mr. Basile says he's okay with

13    the 98; suddenly he's got 147.

14         MS. WINE:  Your Honor, in the presentence report that

15    was dated May 21st, 2001, the $98,000 figure -- I'm scrolling to

16    find the paragraph, but the 98,000 comes from this.

17         THE COURT:  Let me find it.  Let me go to the paragraph

18    and read what you're saying.  What paragraph?

19         MS. WINE:  I'm not there yet.  I'm still looking.

20    Unfortunately I have the updated one in my binder, so I'm just

21    looking at the soft copy.

22         So Your Honor, beginning on page 20 of the 2001 PSR,

23    starting at Paragraphs 140 --

24         THE COURT:  All right.  I see that.  Go ahead.

25         MS. WINE:  It lists these amounts, and these amounts

1    total up to the 98,000.

2         And then to address the additional 49,000, which

3    pertains to 00-673, the defendant has been on notice of that

4    amount since the indictment was returned in that case.  If you

5    look -- or sorry.  Actually, the indictment and the plea.  So if

6    you look at the indictment in Case 00-605, Count 1 that the

7    defendant pled to charges that, "On or about October 1999, the

8    defendant knowingly executed and attempted to execute scheme and

9    artifice," and it says, "by depositing five counterfeit

10   cashier's checks drawn on Huntington National Bank to a bank

11   account in the name of Ave Marshall at First Union Bank."

12        If you look at the defendant's plea agreement, in the

13   Statement of Facts it includes a chart for Case 00-605, and the

14   number that the government is using for the restitution here is

15   the Ave Marshall line, which lists the $49,178.  When the

16   presentence report was prepared, it appears that it only

17   included restitution for Case 00-373.  An amount is required for

18   Case 00-605, and so given where we are in this case, the

19   government has only used the amount that pertains specifically

20   to the charging language in Count 1 that the defendant pled to.

21        THE COURT:  You've lost me now.  I want to see language

22   where something over $98,000 appears.  First of all, I do see in

23   the first PSR at page 20, beginning at Paragraph 138, there is

24   reference to restitution.  And the amount that you come to in

25   that report is $98,513.80.

1              Now, is there a comparable section, Mr. Encarnacion, in

2    the updated report that tells us a bigger number than that, in

3    the presentence report?

4              MR. ENCARNACION:  Not bigger than $98,000, Your Honor.

5              THE COURT:  Okay.  Now --

6              MS. WINE:  Your Honor --

7              THE COURT:  Go ahead.

8              MS. WINE:  Your Honor, you're correct that that

9    amount -- the defendant agreed in his plea to pay restitution in

10   the full amount of the actual total loss caused by the offense

11   described in the Statement of Facts.  The PSR does appear to

12   have only included the amounts relevant to the first case, the

13   00-373.  By the time we got to the sentencing memo, the

14   government identified that we were in the process of trying to

15   confirm victim losses for the second case, the 00-605, and then

16   a restitution worksheet was provided to defense counsel and to

17   the courtroom deputy, Ms. Derro, yesterday evening, once we were

18   able to contact all of the banks.

19             Part of the problem here, Your Honor, is that in the

20   intervening 20 years, as you can tell from the PSR, many of

21   these banks have merged, they've changed locations, et cetera.

22   We wanted to make sure we had tracked this down.  If the Court

23   is inclined not to order any restitution with respect --

24             THE COURT:  Oh, I'm inclined to order restitution.

25   It's the difference between 98 and 147.

25

1          MS. WINE:  Correct.  I was going to say, if the Court

2     is inclined not to order the restitution with respect to the

3     second case, the 00-605, that is the case to which the $49,178

4     pertains.  If the Court is inclined not to enter that

5     restitution because it was not included in the presentence

6     report, that still would not affect the loss amount for

7     guidelines purposes.

8          THE COURT:  Oh, I understand.  Loss amount for

9     guideline purposes is off the table now.  I've decided that.

10    Now, with regard to the loss amount, why is he not still liable

11    for $98,000?  Mr. Basile said they can live with that.  Why

12    can't that number remain?

13         MS. WINE:  That only is the restitution amount that

14    relates to the first offense that he pled to.

15         THE COURT:  Understood.  Understood.  And I'm saying

16    that because of the confusion and just the late worksheet as

17    late as yesterday, I'm not going to accept the additional.

18         MS. WINE:  Correct.  And I was trying to say,

19    Your Honor, that if the Court is not inclined to order the

20    49,000, which pertains to the second case, then the government

21    understands.

22         THE COURT:  All right.  Very well.  The court will

23    order the $98,513.  That will be the amount of restitution.  And

24    I'm not going to -- I agree with Mr. Basile.  I'm not going to

25    the award any greater than that amount.

1           MS. WINE:  Your Honor, just one thing to note.  The

2   government will provide a revised restitution worksheet that

3   includes only the $98,000, and the victim identification for

4   that amount.

5           THE COURT:  All right.  So let me get the exact amount.

6   It's 98 --

7           MS. WINE:  $98,513.80.

8           THE COURT:  Very well.  Well done, Mr. Basile.  Next?

9           MR. BASILE:  Your Honor, the next issue we raised in

10  our memorandum was the departure based on inadequacy of criminal

11  history.  Your Honor, we're asking the Court to recognize the

12  fact that most of the criminal history is based on offenses that

13  occurred 25 years ago, that there's been no offenses in the past

14  20 years.  And we think that really the criminal history in

15  effect is overstated for what the true nature of it is, which is

16  three misdemeanors from 25 years ago, a prior bank fraud which

17  was a relatively small case, for which my client got 16 months -

18  that was 20 years ago, or 21 years ago - and then this instant

19  case.  We think a Category 5 overstates the true nature of the

20  criminal history.

21          THE COURT:  Ms. Wine?

22          MS. WINE:  Your Honor, the criminal history that's

23  included in the presentence report is from the time that the

24  defendant was in the United States.  To give him credit for the

25  fact that this criminal history is quite dated at this point

1    would in essence reward his flight to another country.

2            In addition, the criminal history that is here is of

3    the exact nature that we are dealing with here.  This defendant

4    was on supervised release for bank fraud, for a federal offense

5    of bank fraud, when he committed at least two more offenses of

6    bank fraud.  So we believe that this is actually a proper

7    statement of his criminal history.  Starting with his very first

8    conviction that's included in the presentence report, that

9    involved being in possession of stolen checks.  It is a very

10   similar conduct here.

11           The next one related to assaulting a police officer,

12   which he later had a conviction in federal court for assaulting

13   federal agents in connection with his last sentencing in federal

14   court.  The next one involves another fraud.  This is basically

15   just a case of serial commission of fraud.  I have never seen a

16   presentence report that was so closely aligned with the exact

17   offense that the defendant is here before you.

18           And so we believe that it does reflect the true nature

19   of the criminal history, and it should not be reduced in any way

20   to reflect the age of it, particularly given that the defendant

21   was not in this country for the last 14 years.

22           MR. BASILE:  Your Honor, if I might respond, please.

23           THE COURT:  Go ahead.

24           MR. BASILE:  My response to that is this.  My client is

25   not being rewarded for absconding for those years.  He has

1    already lost enhancements for acceptance of responsibility,

2    possibly for obstruction of justice, if you get to that.  He has

3    lost enhancements for that.  You can bet that in the last

4    20 years, if he had committed crimes in Nigeria, the government

5    would be asking that he be crucified for that.  Okay?

6         I just ask that he be given some credit for the fact

7    that we've submitted a Nigerian criminal police record which

8    shows that he has had no offenses since the instant offense that

9    we're here for.  I just think that ought to figure into the

10   criminal history.

11        THE COURT:  Okay.

12        MR. BASILE:  This is not a one-way street, Your Honor.

13   We take the good with the bad, okay?  He absconded.  I don't

14   know if you're going to consider that or not --

15        THE COURT:  I'll consider it.

16        MR. BASILE:  We do have a witness who is waiting to

17   corroborate some of what he told the Court.  I don't know if

18   Your Honor wants to get into that at this point.  But all I'm

19   trying to say is that he's being punished already, and I think

20   part of the whole picture in this case has to do with what he

21   has done since that time.  And the guidelines say that

22   rehabilitative efforts, wherever and whenever they occurred, is

23   something to be considered by a court in applying the

24   guidelines.

25        So for that, I just feel the criminal history is

1    overstated.

2         THE COURT:  All right.  That's fine.  You've made your

3    record.  I reject it.  He's been gone for many years.  He's

4    going to be sentenced in the first part for what he did and what

5    he was convicted of -- pled to, rather.  We'll take into account

6    his absconding later on.  But you don't get to rework his

7    criminal history, because as far as he tells us, as far as the

8    Nigerian record else tells us -- by the way, the last Nigerian

9    record I received from Nigeria in another case was forged.  I

10   just want to let you know that about my confidence in Nigerian

11   records.  But that aside, even if he's been fine for all these

12   years, he doesn't get to have us ignore where he was supposed to

13   be when he was supposed to be sentenced.

14        He's a Criminal History 5 category.  If you think that

15   he's been rehabilitated since then, you're free to argue that on

16   allocution.  But your objection as to the formal overstatement

17   of the criminal history is rejected.  Anything else?

18        MR. BASILE:  Yeah, we objected to the adjustment for

19   acceptance of responsibility.  We think he should be given the

20   points, the levels for acceptance of responsibility.  And I'll

21   rest on that, Your Honor.  He did plead guilty, he did not delay

22   the prosecution of the case, he did --

23        THE COURT:  Wait a minute, what did you just say?

24        MR. BASILE:  He did not delay the prosecution of this

25   case.

1          THE COURT:  Well, what is a prosecution?  You mean to

2    the point where he's going to be sentenced?

3          MR. BASILE:  It means that he pled guilty very early

4    on, before it came anywhere near a trial, and did not put the

5    government to its proof in this case.  And he confessed to the

6    police as to what he did.  So I just think that he ought to get

7    something for the acceptance of responsibility.

8          THE COURT:  All right.  Ms. Wine, response?  Ms. Wine?

9    Apparently she's not hearing me.

10          (Technical discussion off the record.)

11          THE COURT:  The issue was about not getting credit for

12    acceptance of responsibility.

13          MS. WINE:  Yes, Your Honor.  We don't believe that the

14    three-point downward adjustment for acceptance of responsibility

15    applies in a case where the defendant fled to Nigeria prior to

16    sentencing, and had no contact that we are aware of with the

17    government or the court over a period of 14 years.  And that is

18    consistent with the law of the Fourth Circuit in both

19    *United States vs. Miller*, 77 F.3d 71 - that's from the

20    Fourth Circuit in 1996 - as well as *United States vs. Hudson*,

21    which is 272 F.3d 260, and that's Fourth Circuit from 2001; both

22    cases denying credit for acceptance of responsibility for

23    defendants who also claimed to have absconded for fear of their

24    lives.

25          MR. BASILE:  Your Honor, if I may respond.

1    *United States vs. Hudson* is not applicable in this case.  That

2    was a case where a person absconded because he was afraid of the

3    sentence he was going to get, not because he was afraid of his

4    physical safety.

5          Now, whether Your Honor believes Mr. Adesioye or not

6    for his reasons, if you find that he absconded because of safety

7    fears, then the *Miller* case applies not at all in this case.  In

8    fact, the Fourth Circuit said that under extraordinary

9    circumstances -- a person may be entitled to acceptance of

10   responsibility if there were extraordinary circumstances.  And

11   we suggest that if you buy the story in this case, or believe

12   it, that that would be an extraordinary circumstance.  That's

13   just the opposite of what was in the Fourth Circuit case that

14   counsel cited.

15         THE COURT:  All right.  Your objection with regard to

16   the failure to give credit for -- an adjustment for acceptance

17   of responsibility under guideline 3E1.1 is denied.  It's true

18   that the defendant did agree, up to a point, to accept

19   responsibility, and then he stopped.  And part of his

20   responsibility was cooperating, and he stopped when he knew he

21   wasn't through there.  And he disappeared for many years.

22   That's not comprehensive acceptance of responsibility.

23         And I don't know that it really makes any difference

24   whether he was fearful of his sentence or he was fearful for

25   retaliation or whatever.  The fact of the matter is, he doesn't

1  get acceptance of responsibility because he didn't fully embrace

2  it, for whatever reason.  And therefore your objection is

3  denied.  The two-level -- sorry, the potential three-level

4  enhancement under 3E1.1 is denied.

5          Are there any further objections to the presentence

6  report, Mr. Basile?

7          MR. BASILE:  No, Your Honor.

8          THE COURT:  Then the court will accept the presentence

9  report as written, with no changes.  We end up with a total

10  offense level of 5, criminal history category 23.  The guideline

11  range is 84 to 105 months.  The supervised release range in

12  00-373 is up to three years; 00-0605 up to five years.  The fine

13  range as to 0373 is not more than $250,000; the fine range in

14  0605 is not more than a million dollars.  And I indicated that

15  the amount of restitution was the $98,513.80.

16          All right.  Now, that said, I am prepared to hear

17  allocution, Ms. Wine.

18          MR. BASILE:  Your Honor, I had a witness here who is --

19          THE COURT:  I apologize.  You did.  You may call him.

20          MR. BASILE:  He was going to corroborate some of the

21  things that --

22          THE COURT:  Fair enough.  I forgot about it.  Go ahead.

23          MR. BASILE:  Yes, Victory Oluwasegun.

24          (Oath administered by courtroom deputy clerk.)

25          COURTROOM CLERK:  Please state your full name for the

1    record, and spell each name.

2          THE WITNESS:  Victory Yemi Oluwasegun, V-I-C-T-O-R-Y,

3    Y-E-M-I, O-L-U-W-A-S-E-G-U-N.

4          COURTROOM CLERK:  Thank you.

5          THE COURT:  All right, Mr. Basile.

6     **(VICTORY YEMI OLUWASEGUN, having been duly sworn, testified as**

7                           **follows:)**

8          **EXAMINATION BY COUNSEL FOR DEFENDANT**

9    BY MR. BASILE:

10   Q.  Mr. Oluwasegun, how long have you known Mr. Adesioye, the

11   defendant in this case?

12   A.  Pretty much all his life.

13   Q.  And in what capacity?  Were you a coworker or a friend, a

14   family friend, or what?

15   A.  Cousin.

16   Q.  And where do you live, by the way?

17   A.  I live in Fort Lauderdale, Florida.

18   Q.  Okay.  Now, let me direct your attention to January of 2005.

19   It's already been testified and agreed in this case that he went

20   to Nigeria in that month.  Do you recall his going to Nigeria?

21   A.  I recall that, yeah, he ended up in Nigeria, yes.

22   Q.  Okay.  And let me ask you, in the early part of January 2005

23   or the late part of December, did you witness any unusual

24   communications between him and third persons?

25   A.  Yes.

1    Q.  And tell me what they were and what you witnessed and heard.

2    A.  He was in a scuffle with a gentleman.  I don't know who the

3    gentleman was, but I did see him in a scuffle.  Prior to me

4    getting to the location, they had broken up -- they had

5    separated the two gentlemen, and I wasn't able to find out

6    exactly the details of why they were engaged with one another.

7    But it was a pretty serious -- it was pretty serious -- they

8    were fighting, and they looked like they were pulling their

9    punches.  They looked like they were seriously engaged.

10   Q.  All right.  Did you ask Mr. Adesioye what started that

11   scuffle?

12   A.  I had asked him over the phone after the fact, because we

13   weren't able to talk on site, and he said for fear of his life,

14   he doesn't want to talk about it right now.

15   Q.  Okay.  And where did the scuffle take place specifically?

16   A.  I believe it was in front of a club in D.C.

17   Q.  Okay.  Now, at that time did Mr. Adesioye make any

18   statements to you regarding his physical safety?

19   A.  Yeah, he told me that he --

20   Q.  I'm sorry, excuse me.  When I say "at that time," I mean

21   early January -- late December 2004 or January of 2005, did he

22   tell you about any fears he had about his security?

23   A.  Yes, he told me that he did fear for his life.  And I asked

24   him what is he going to do, and he told me he doesn't know but

25   he can't talk right now.  So I asked to meet with him, and he

1    wouldn't agree on a time or place.  He said he will get back

2    with me.

3    Q.  Okay.  And did you and he ever have these discussions on

4    more than one occasion, or was it just that one time?

5    A.  The next time we spoke about it, he was already outside the

6    country.

7    Q.  Okay.  Did he say anything to you about his children?

8    A.  Yes, he had mentioned that because of what was going on, he

9    wasn't sure what was going to end up happening; that if anything

10   did happen, if I could look after his kids, at least check in on

11   them and make sure they were okay.

12   Q.  Where was he when he told you that?

13   A.  He was here.  He was here in the United States on the phone.

14   Q.  And what year and month was that?

15   A.  That was in January, I guess, of 2005.

16   Q.  And do you recall any other conversations between you and he

17   at that time regarding his physical safety?

18   A.  Regarding his...yeah, the same conversation.  He said he

19   wasn't very sure of what's going to happen to him, but he wanted

20   to make sure that he did not end up dead.

21   Q.  Okay.  And was that the end of the conversations between the

22   two of you?

23   A.  At that time, yes.

24   Q.  Okay.  And did you talk to him before he left for Nigeria,

25   after what you just told us?

1    A.  Afterwards, no.  The next time I will speak to him -- I

2    tried to reach out to him several times, but the next time I was

3    able to speak to him, he was already outside the country.  And

4    he said that he was not in a position to talk prior to that

5    because he was in fear for his life, so he had to leave.

6    Q.  Okay.  Did he tell you when he was coming back?

7    A.  No.  He said he would try to get back as soon as possible,

8    when things die down, but right now he's not safe there.

9    Q.  Okay.

10           MR. BASILE:  That's all the questions I have,

11   Your Honor.

12           THE COURT:  Okay.  Cross?

13           MS. WINE:  Yes, Your Honor.  Just one question.

14           **EXAMINATION BY COUNSEL FOR THE UNITED STATES**

15   **BY MS. WINE:**

16   Q.  Did you report this incident to the police?

17   A.  No, I did not.

18           MS. WINE:  Nothing else, Your Honor.

19           THE COURT:  Were you aware that the defendant was

20   involved in these bank scams?

21           THE WITNESS:  No.  We saw each other in social

22   gatherings, but I didn't know what he was doing.

23           THE COURT:  Well, did you know he had been convicted,

24   pled guilty to these bank scams at the time he told you he was

25   being threatened and was going to leave the country?  Did he

1      tell you he was going to leave the country, first of all?

2                  THE WITNESS:  No.

3                  THE COURT:  He just told you he was being threatened?

4                  THE WITNESS:  He told me that his life was in danger.

5                  THE COURT:  Did he tell you why?

6                  THE WITNESS:  He said he wasn't comfortable telling me

7      over the phone.  So I told him we can meet somewhere so we can

8      talk about it, if there's anything I can do to help; he said

9      he'll get back with me.

10                 THE COURT:  And he never did?

11                 THE WITNESS:  He never did.

12                 THE COURT:  So you don't know whether he had pled

13     guilty to crimes, for example --

14                 THE WITNESS:  I was not aware.

15                 THE COURT:  You think he just left the country because

16     somebody for some reason had threatened him?

17                 THE WITNESS:  That's correct.

18                 THE COURT:  You didn't wonder why that might be?  Did

19     you ask him, why are they threatening you?

20                 THE WITNESS:  Yes, I did.  That's what I referred to.

21     I asked him several times, and because he said he didn't want to

22     talk about it over the phone, I had no choice but to back off.

23                 THE COURT:  Okay.  So all you knew is he told you

24     someone threatened him, but not why.

25                 THE WITNESS:  No, he said he couldn't give me the

1   reasons over the phone because he wasn't sure if his phones were

2   tapped or whatever.

3           THE COURT:  Okay.  All right.  Thank you.

4           Any other witnesses, Mr. Basile?

5           MR. BASILE:  No, Your Honor.

6           THE COURT:  All right.  Governmental allocution?

7           MS. WINE:  Yes, Your Honor.  The government -- as set

8   forth in the sentencing memorandum, the government believes that

9   the 3553 factors in this case urge a sentence at the top end of

10  the guidelines range of 105 months.  We believe that is the

11  sentence that is sufficient but not greater than necessary to

12  comply with the purpose of the sentencing statute.

13          Turning first to the nature and circumstances of the

14  offense, we've already spent a good deal of time on the amount

15  of the checks and the intended loss of both of these schemes,

16  that it was over $350,000.  The fact that the defendant was on

17  supervised release for another federal bank fraud offense less

18  than one year -- and committed these offenses less than one year

19  after having been released from incarceration we believe urges

20  for a high end guideline sentence.

21          In addition, the history and characteristics of the

22  defendant urge us to look at these offenses that are outlined in

23  the presentence report.  There is a pattern of criminal behavior

24  involving fraud by the defendant beginning in 1994.  At the time

25  that the defendant committed these instant offenses, as I said,

1    the defendant was on supervised release in the District Court

2    for the District of Columbia, and that was based both on his

3    1995 conviction for bank fraud as well as a 1996 assault on a

4    federal officer that occurred during the sentencing on his bank

5    fraud conviction in the District Court in D.C.

6          The defendant also had previous state convictions for

7    receiving stolen goods, for another misdemeanor assault on a

8    police officer, as well as other frauds.  At its base, this is a

9    serial fraudster that is before you here today, Your Honor.

10         And I believe that the details of the assault in the

11   District Court in D.C. are worth repeating here.  They are

12   disturbing and they do detail that this is not simply a

13   nonviolent criminal that you have before you.  After being

14   sentenced on the bank fraud conviction there, a Deputy

15   U.S. Marshal went to escort the defendant out of the courtroom,

16   as has happened many times in Your Honor's courtroom; the

17   defendant then refused to be escorted out, pushed the Deputy

18   U.S. Marshal.  The case agent that had been involved in

19   investigating that bank fraud scheme, who was a postal

20   inspector, attempted to assist the Deputy U.S. Marshal; at that

21   point the defendant verbally threatened the federal agent's

22   life.  He then physically assaulted that agent.  A courtroom

23   security officer is called to the courtroom to intervene, at

24   which point he is bitten by the defendant.

25         So this is -- the last time that the defendant was in

1    federal court being sentenced, this is the behavior that took

2    place.  We think his history and characteristics, together with

3    his pattern of consistent fraudulent behavior, and the fact that

4    these crimes were committed less than one year after he was

5    released from incarceration, urge in favor of a serious sentence

6    here.

7            In addition, the seriousness of the offense, the

8    respect for law, and the need for just punishment here, we

9    believe urge a top end guidelines sentence.  Again, the

10   defendant committed these offenses while he was on supervised

11   release.  While he was on pretrial release in this case, the

12   defendant fled the country to avoid sentencing for a period of

13   more than 14 years.  And these two factors are taken into

14   consideration in our recommendation of a high end guidelines

15   sentence.

16           Likewise, there's a need to provide adequate

17   deterrence.  I know Your Honor spoke about this earlier in the

18   hearing here today, to say you don't simply get to flee.  You

19   don't get to simply flee and avoid sentencing under the

20   circumstances here.  So we think that the need for adequate

21   deterrence both as a serious bank fraud crime -- these types of

22   crime are still occurring.  We think it's important to send a

23   message that they are treated seriously, as well as the

24   defendant's behavior subsequent to entering his plea warrant the

25   high end guidelines sentence.

1          And then finally, we do ask for the restitution to be

2    paid.  Your Honor has already addressed that so we don't have to

3    address it here.

4          But for those reasons, we believe that this is a unique

5    case.  This is a case where we have a defendant that committed a

6    variety of bank fraud over a fairly long period prior to these

7    offenses, that was already under supervised release with the

8    trust of the court when he committed these offenses, and was

9    further given the trust of this court when he was released

10   pending his sentencing.  And he has shown an utter lack of

11   respect for the court in his behavior, and that further, we

12   believe, urges in favor of the high end guidelines sentence of

13   105 months that the government is seeking here.

14         THE COURT:  All right.  Mr. Basile?

15         MR. BASILE:  Your Honor, we absolutely dispute the

16   recitation of facts about what happened with a federal official

17   and this so-called assaulting a federal official.  And I would

18   like my client to testify on that if Your Honor is going to

19   seriously consider what happened in that case.

20         THE COURT:  I won't.  I don't need to consider it.

21   It's not going to factor in.

22         MR. BASILE:  Fine, Your Honor.

23         Let me go on to say, I submitted a lengthy memo.  I'm

24   sure Your Honor read it carefully.  I know Your Honor's feeling

25   about Nigerian police charge -- character certificates.  For

1   what it's worth, I have the original; it looks pretty genuine to

2   me.

3           And one thing that I think the Court is supposed to

4   consider under the guidelines is rehabilitative efforts.  Okay?

5   Now, he understands that he doesn't get a medal for absconding

6   to Nigeria, but I think it's important to see what he did when

7   he went to Nigeria, because that is a factor in determining if

8   he's a threat to society, if he's a threat to recidivate, and so

9   on and so forth.

10          And I accept what the Court has said about somebody

11  running off, and that that's just not something we can do.  I

12  understand that, Your Honor.  But I also would say that assuming

13  there's some credence to what my client said about people who

14  were threatening him because of his cooperation, you know, this

15  would not be the first time that something like this has

16  happened.  Certainly it discourages people from cooperating with

17  law enforcement if they put themselves on the line physically,

18  security wise, and they don't have a way to deal with it.

19          And that's what happened in this case.  He was 20 years

20  old, or roughly 20 years old.  He got caught between a rock and

21  a hard place.  He says that he had reported this to the FBI.

22  Reporting this to the local police is a waste, frankly, and not

23  something that would accomplish much of anything, really.  So

24  he's faced with a lot of threats because of his cooperation.  I

25  don't know what a man in his position does at that point in

1    time.  Do you keep cooperating and --

2          COURTROOM CLERK:  Mr. Basile, we have a public access

3    line.  Do I need to remove it?

4          MR. BASILE:  No.

5          THE COURT:  Go ahead.

6          MR. BASILE:  So I don't know what a person in his

7    position does, whether you just say, I'm no longer going to

8    cooperate, I just go off to jail and take a long sentence and

9    worry about what happens to me in jail?  Or do I just escape

10   from this and make a comeback at a later point in time when it's

11   safe for me to do so?  That's really what he's faced with.

12         Your Honor, I can tell the Court that I was in touch

13   with him for a couple of years before he actually came back to

14   JFK airport, and I knew -- he was talking to me about exactly

15   what he's saying today:  I've been to the embassy, they won't

16   give me a passport, they're tying me up in red tape; can you

17   help me out.  That's when he first came to me.

18         I went to the U.S. Attorney in Baltimore and I went to

19   the U.S. Attorney in Greenbelt, and I told them:  We want to

20   turn ourselves in; can you help us get him back to this country?

21   And the response I was met with, Your Honor, is:  We don't have

22   the file.  And there just wasn't any interest in doing that.

23   Okay?

24         Now, certainly my client would have come back sooner -

25   and I can tell you that - if we had had some more help from the

1    government and the U.S. to get him back here.  Nobody thought it

2    was a priority until he gets back, and then everybody jumps up

3    and starts talking about what a horrible person he is.

4         He'll tell you that he understands that what he did was

5    wrong.  But, Your Honor, this is not a black and white case, in

6    my opinion.  There are shades of gray here.  I think he

7    understood that he, number one, needed to rehabilitate himself.

8    He did.  I believe the exhibits that we've attached show you

9    that he became a productive citizen, a non-criminal citizen, for

10   the last 15 years.  And whether he gets credit for that or not,

11   it is what it is.  And I think a court should consider what his

12   behavior has been over the past 15 years or whatever.  Okay?  I

13   think the Court should consider it.  And you said that you won't

14   consider his record from long ago, but I'll just say --

15        THE COURT:  No, I didn't say that.  That I'm not going

16   to consider his record from long ago, is that what you said?

17        MR. BASILE:  I misspoke.  I'm sorry, Your Honor.  Let

18   me address that, then.

19        Your Honor, he was a 20-year-old man; an 18-year-old

20   man at that point in time.  He's now a 45-year-old man.  He's a

21   different person than what he was 15 years ago when he faced the

22   Court.  And I understand how Your Honor feels about this, but I

23   think he deserves some credit.

24        And speaking of credit, by my calculation, when he was

25   incarcerated from his arrest in July and released at the end of

1    May, he served 314 days at the CDF.  When he came back, he was

2    arrested at the airport and served another 414 days.  So as of

3    today, by my calculation, he has served 24 months; of course I

4    assume that he will get credit for that.  I would ask -- I want

5    Your Honor to know that he has served that amount of time and --

6           THE COURT:  Well, let me stop you.  Does the government

7    agree on how much time he's credited with?

8           MS. WINE:  Your Honor, I believe that we would need to

9    confirm it.  I don't know if pretrial has any more information

10   than I do, but as I sit here today, I would need to confirm

11   that.

12          THE COURT:  He'll get credit for time served,

13   Mr. Basile.

14          MR. BASILE:  Okay.  And I'm telling the Court that so

15   far it's been 24 months.

16          THE COURT:  We'll see.

17          MR. BASILE:  And I'm just basing it on the figures in

18   the Statement of Facts from the government.  All you have to do

19   is add up the dates.

20          THE COURT:  Okay.  We'll confirm.

21          MR. BASILE:  Very well, Your Honor.  And so he has

22   already served part of his punishment.  Okay?  He hasn't been

23   scot-free for all this time.  And he served it under pretty

24   miserable circumstances.  We went into detail about what the

25   conditions were in CDF.  His sentencing was continued a number

1   of times.  It's been over a year between being taken into

2   custody and being sentenced, and during that time, instead of

3   going to a relatively decent federal institution, he's been held

4   in CDF, which was in itself a horror show and a punishment.

5          And at the time that I submitted my pretrial

6   memorandum, since that time, with the COVID virus, he informs me

7   that in his unit, 15 to 20 men have had the virus, and he tells

8   me that three actually died.  He was exposed to this.  I think

9   it's something that the Court should consider in imposing a

10  sentence in this case.

11         And all I can say is, at this point in time and for a

12  long time he's been remorseful.  He's just -- you know, I don't

13  know what more you can say about it.

14         The one last thing I would point out for the Court, and

15  I find this interesting.  The government has talked about the

16  need for deterrence, and that a heavy sentence is necessary in

17  this case to serve a deterrent purpose.  And I ran across two

18  items.  One was a study done by the National Institute of

19  Justice - part of the Justice Department - in which they did a

20  study of inmates and found that -- and came to the conclusion

21  that the length of the sentence is not what deters criminal

22  activity, it's the certainty of being caught, is what they said

23  that deters criminal activity.

24         And the sentencing commission this year actually did a

25  study of drug offenders, and they did this study because

1    apparently there was a change in the guidelines which said that

2    drug offenders, after a certain date, would get a reduction in

3    sentence, a reduction in points.  And they started these two

4    groups.  The group that got --

5         THE COURT:  I don't know how much you're going to read

6    about this report.  I really don't have time to hear about the

7    whole report.  You need to abbreviate your comments.  We're into

8    our third hour now.  So move along.  I understand your

9    proposition that the length of the sentence, you say, doesn't

10   deter.  I would tend to disagree with you, whatever the report

11   says, but I understand that there is some sort of report out

12   there, potentially academic, which says contrary.

13        MR. BASILE:  All right.  The last thing I would say,

14   Your Honor, is that the U.S. Sentencing Commission found that

15   the early release group had actually a lower recidivism rate

16   than the group that had been serving out a full amount of time.

17   It was a three percent difference; statistically the same.  So

18   it didn't really matter as to what the length of the sentence

19   was in terms of recidivism effect or deterrent effect.

20        And with that, Your Honor, I think Mr. Adesioye would

21   like to be heard.

22        THE COURT:  Mr. Adesioye, you may address the court

23   before I go to sentencing.

24        COURTROOM CLERK:  Your Honor, hold on just a moment.  I

25   have to unmute him and then it takes a little bit.

1          THE COURT:  All right.

2          THE DEFENDANT:  Good afternoon, your honorable judge,

3     sir.  I thank the lord for keeping you and your family and

4     everybody safe during this pandemic, and for giving me this

5     opportunity to clear myself.  I would like to apologize to the

6     courts, this honorable court, and my family for my actions.  I

7     take responsibility for my disgraceful actions and for putting

8     my family through this at this time.  I am very sorry,

9     Your Honor.

10         Your Honor, sir, growing up I made a lot of stupid

11     decisions.  Whenever I reflect on my past, I am very

12     disappointed, I am embarrassed, and I'm ashamed of it.  Coming

13     from a strong Christian background, I had the parents that took

14     pride in education, sir.  At eight years old, sir, my mother

15     became a single mom.  She worked two to three jobs just to make

16     me and my sisters happy, and I still disappointed her with my

17     disgraceful actions.  In my teenage years, sir, I was a

18     disgrace.

19         Your Honor, my actions and decisions in the past,

20     growing up, were very disappointing.  When I reflect on them,

21     most especially now that I have my own kids that are getting of

22     age, I always worry that they don't make the same stupid

23     decisions I did in the past growing up.  I am not there to guide

24     them, because my father was not there and the cycle is repeating

25     itself.  Your Honor, sir, ever since I became more mature and I

1    became a born again, I've discovered myself.  Through my

2    choices, I realize the need to impact humanity positively in all

3    I do, always.

4         Your Honor, I am not proud of myself for my decisions I

5    made in the past.  I believe I caused the loss of my sister when

6    she was pushed and she died from blood clot.  I believe I caused

7    the death of my father from the stress I gave them growing up.

8    He died of a stroke because of me.

9         I know my decision was foolish.  I was afraid for my

10   life.  I was being threatened a lot, Your Honor.  I was being

11   threatened a lot.  I told my lawyer then; he told me he will

12   reach out to the FBI.  I tried to reach out to them, all to no

13   avail.  I remember through all of this I was asked to do by the

14   FBI, looking for terrorists, going for interviews, going for

15   undercover jobs, I did everything I was told to do, even more.

16   I even went out of my way to buy a car so they could put cameras

17   in it.

18        What also added to my fear, sir, was because in 1998 I

19   got shot.  Until today, nobody has arrested somebody that shot

20   me.  I was scared for my life.  I'm not trying to justify my

21   actions, Your Honor, but I was just afraid for my life.  That's

22   all.  The threat was becoming too much and confrontational.

23   After I left, I tried to reach out to the U.S. Attorney, to the

24   FBI.  I left messages.  Nobody called back, not one.

25        I believe, sir, though I left to Nigeria, it has

1    reshaped me and allowed me to become a better person and a good

2    contributor to humanity.  Your Honor, I believe that I have been

3    able to change and give positively, Your Honor, to the community

4    that I was in.

5            I tried relentlessly to turn myself in, going back and

6    forth to the U.S. embassy.  I didn't get a way in until God just

7    helped me and I was able to.  And I reached out to my lawyer,

8    Richard Basile, a while back, for him to also try to reach out

9    to the FBI and the government so I could come back and do the

10   right thing.  Nobody answered.  But when I put up a fit, I got a

11   passport to come back and I bought a ticket right away to turn

12   myself in.

13           Your Honor, sir, I know my decision as a teenager was

14   out of fear for the threat of my life.  I didn't want to get

15   killed.  I just wanted to do the right thing.  And I believe

16   that God wanted to teach me a lesson, because the struggle in

17   Nigeria was not an easy one.  But I thank God for it.  It made

18   me a better person, it made me mature, it made me value life, it

19   made me value freedom, respect for law.  I worked with

20   government in Nigeria and I know the importance of trust, of

21   humanity.

22           I thank God that he's given me opportunity now to right

23   my wrong.  I did wrong, and I know I deserve a punishment.  But

24   I want the biggest gift of all, to gain the trust of my kids

25   back, to gain the trust of God, and to gain salvation.  I want

1   that salvation.  Because in my mind, when I was in Nigeria, I

2   was in prison.  I wasn't happy.  I might have looked happy, but

3   I was never happy, Your Honor.

4           I pray you'll find it in your heart, I pray you find it

5   in your heart to tender justice with mercy.  I am sorry I'm not

6   perfect.  I am sorry I made a mistake.  I'm sorry I was young

7   when I made those mistakes.  I'm sorry, Your Honor.

8           THE COURT:  All right.  The sentencing guidelines are

9   between 84 and 105 months.  That's what they would have been had

10  you been around back when you were supposed to be sentenced.

11  Basically you're asking the court to overlook the last 14 years,

12  for whatever reason.  You were afraid, and maybe you were, in

13  one way or another, threatened.  You got a few -- I don't know

14  how many, a few threatening phone calls, and you were roughed up

15  on a few occasions.  That's what you tell me.  And I hear you

16  saying that.  Some of the things you say, from a credibility

17  standpoint, I have some difficulty believing; that you were

18  dissuaded by the American embassy from coming back.  Clearly you

19  were playing games with your passport because you weren't

20  supposed to be traveling.  Not only did you flee, but you fled

21  against a condition of your release, which was not to travel

22  without permission.  So you used an expired passport, I guess,

23  to get something like a travel certificate, I guess, to come

24  back.  I don't know how you got out of the country.  That still

25  is very murky.  But you obviously did some quick movements to do

1    that.

2           Let me go back to the factors here that I look at under

3    the sentencing guidelines, 18 U.S.C. Section 3553.  The first

4    thing is, what is the seriousness of the offense.  What is it

5    that promotes respect for the law and provides just punishment?

6    Well, looking alone at your record, before we talk about your

7    time over in Nigeria, pretty serious.  Major bank frauds over a

8    period of time.  We established 20 years ago, but you committed

9    serious crimes.  And to come in even 20 years later or however

10   when it was, and say, "I'm sorry, I've changed," doesn't change

11   the fact of what you did.  It wasn't like you stole a loaf of

12   bread and were being chased down by someone in "Les Miserables."

13   You did serious crimes and disappeared, so you have to be called

14   to account for that.  Those are serious.

15          How do I promote respect for the law if I say:  Oh,

16   it's okay if you go away if you've been threatened, if you're

17   fearful?  How do I provide just punishment?  How do I deter

18   others?  Now, put yourself in the judge's position.  There's

19   no -- first of all, a lot of people have cooperated with the

20   government over the years.  A lot of people are fearful about

21   that.  But they don't run and hide, which is what you did.  You

22   did that and you're using that.

23          If I say to you, "Okay, understood, forgive him," what

24   am I saying to everybody else who decides to run when it's time

25   to impose a sentence?  "I was afraid, I was threatened, I

1    couldn't.  Judge, don't take it into account, I'm a changed

2    man."  That simply doesn't work consistent with sentencing.  It

3    absolutely is unacceptable, from my standpoint, for you to

4    basically choose your timetable when you will serve your time.

5           When you say God reached you, when you say you were a

6    changed man, you came back, and, "Now I'm ready to serve my

7    time," you said.  Why can't every defendant say that?  "I'm not

8    ready to serve my time, Judge; I'm not ready to serve my time,

9    Prosecutor; I'm not ready to serve my time, American public,

10   because I need to get some things together.  I'm a little

11   anxious for myself.  When I'm ready" -- and you said it was at

12   least 12 years before you decided to even come back.  It wasn't

13   until 2017 that you started to take action to come back sooner.

14          So you have 12 years where you say you were a prisoner

15   in your own mind, but you're the guy who is determining your own

16   timetable as to when you're going to serve.  Unacceptable.

17   You're a convicted criminal, and you were at that time, and you

18   are now.  You don't get to do that.  If you did that, the system

19   would just not work at all.

20          When it's convenient, for whatever reason, for someone

21   who is convicted of a crime to serve, they can stay away and

22   say, "I was afraid to come back any sooner, I was afraid

23   something was going to happen to me," that is one of the more

24   serious components.  Although you've got such a long history of

25   fraud in your case, fraud when you were already guilty of fraud

1    and you're back again committing fraud.  I mean, whether you

2    were 20 or not; 20 is not the most perfectly formed mentality,

3    but it's still enough to know what you're doing.  Those are the

4    things that you're doing.

5         So I don't know whether you will commit crimes in the

6    future.  You're going to be away for a considerable period of

7    time, so I certainly can deter your criminal conduct on your

8    part for a period of time.  And maybe you won't commit crimes.

9    I hope you won't.  Because if you're back in court with this

10   kind of history, you'll spend the rest of your life in jail.  I

11   mean, that's the reality.  So maybe it's not so much a

12   consideration of what we need to deter you.  We certainly need

13   to deter others from deciding they will run from sentencing,

14   which is what you did, and just absolutely ignore their

15   responsibility for crimes.

16        So that's where I come to.  I don't know that you need

17   any special mental health counseling or anything of that order.

18   I don't think there was a proposition for that.  No drug issues

19   for you.  But you definitely need to be held accountable for the

20   time, in prison and for the time afterwards, which you'll be on

21   supervised release.  I'm going to give you a sentence that

22   significantly does take into account the fact that you lived

23   free, whatever was troubling you, for a number of years.  I'm

24   not going to give you 14 years more, when you were free, but I'm

25   going to account for some of the time that you spent on your

1    own, at your own timetable.  Not perhaps leisurely, but on your

2    call.  And I don't think you can do that.

**(CONFERENCE AT THE BENCH.)**

**(It is the policy of this Court that every guilty plea and**

**sentencing proceeding include a bench conference concerning**

**whether the defendant is or is not cooperating.)**

**(OPEN COURT.)**

8         THE COURT:  With regard to Count 1 in 00-0373, I'm

9    going to sentence you to 60 months in custody, which I think is

10   the statutory maximum for that count.  With regard to 00-605,

11   I'm going to sentence you to 153 months.  That goes 48 months

12   above the 105 months, and that accommodates for what I think are

13   the total circumstances of your case, including but not limited

14   to the fact that for 14 years - or even 12, to take your word

15   for it - you lived away and didn't come back.  But in any event,

16   I think that those are significant issues for the enhancement.

17   I don't think that the two-level enhancement -- that's why I was

18   making a point of saying I'm not going to count the absconding

19   as part of a two-level enhancement, because I don't think it

20   does justice to what you did here.  But the 153 months overall I

21   think accommodates justice in this case.

22         I'm going to sentence you, in 00-0373, to three years

23   supervised release, and in 00-605 to five years concurrent.  And

24   by the way, the sentence as to custody is also concurrent.  It's

25   60 months on Count 1 in 00-373, and 153 months concurrent in

1    00-605.

2          And the restitution -- I think there's a special

3    assessment of $200 due and payable at this time; restitution in

4    the amount of $98,513.80 payable to the clerk of court or to

5    such persons as the clerk indicates may be due that money.

6          On your supervised release terms, you are subject to

7    the terms and conditions of supervised release which I will read

8    to you now.  There are some general terms and then there are

9    some specific terms which you need to hear about.

10          While you're on supervised release, you must not commit

11   another crime, federal, state, or local.  Mr. Adesioye, are you

12   there?  All right.  No crimes while you're on supervised

13   release.  That's when you get out.

14          You must not unlawfully possess a controlled substance.

15   You must refrain from any unauthorized use of a controlled

16   substance at any time.  You must make restitution, as I

17   indicated before.  You must cooperate in the collection of DNA

18   as directed by your probation officer.

19          You must report to your probation officer in the

20   federal district where you're authorized to reside within

21   72 hours after your release from custody, and you must report as

22   instructed.  You must not knowingly leave the federal judicial

23   district where you're authorized to reside without first getting

24   permission from the court or from the probation officer.  Let me

25   repeat that.  You must not knowingly leave the federal judicial

1    district - that's Maryland - where you are authorized to reside,

2    without first getting permission from the court or probation

3    officer.

4            You must truthfully answer questions asked by your

5    probation officer.  You must live in a place approved by your

6    probation officer.  If you plan to change where you live or

7    anything about your living arrangements, such as the people that

8    you're living with, you must notify your probation officer at

9    least 10 days before any change.  And if you can't do that for

10   some reason, due to unanticipated circumstances, you must notify

11   your probation officer within 72 hours of becoming aware of the

12   change.

13           You must not communicate -- this is important for you

14   to hear this because you've told me about your background and

15   your hanging out.  You must not communicate or interact with

16   someone you know has engaged in criminal activity, meaning some

17   of these guys that you were involved with back when.  If you

18   know anyone who has been convicted of a felony, you must not

19   knowingly communicate or interact with that person without first

20   getting the permission of the probation officer.

21           If you are arrested or questioned by a police officer

22   or law enforcement officer, you must tell your probation officer

23   within 72 hours.  You must not own, possess, or have access to a

24   firearm, ammunition, destructive device, or dangerous weapon, or

25   anything that could be modified to cause bodily injury or death

1     to another person such as nunchakus or tasers.

2         And this is important.  You must not act, or make any

3     agreement with a law enforcement agency to act, as a

4     confidential human source or informant without first getting

5     permission of the court.  As of now, you do not have that

6     permission.  You may not rely on earlier discussions about

7     working with anyone.  So that's important.  You would have to

8     get further authorization to do that.

9         If you are determined to pose a risk to any other

10    person, including an organization, your probation officer may

11    require you to notify that person about the risk.  You must

12    comply with that instruction.  The probation officer may contact

13    that person or entity and confirm that you've been notified

14    that -- that they've been notified about your risk.  And, of

15    course, you must at all times follow the reasonable instructions

16    of your probation officer related to the conditions of

17    supervision.

18        Now, the special conditions of supervised release that

19    are added to that, we will make this available to you through

20    Madam Clerk.  You must provide the probation officer access to

21    any requested financial information, and authorize the release

22    of any financial information.  The probation office may share

23    financial information with the U.S. Attorney's Office.

24        Further, you must not incur any new credit charges

25    without -- or open additional lines of credit without approval

1    of your probation officer.  Further, you must pay any

2    outstanding restitution ordered by the court jointly and

3    severally with any co-defendants in monthly installments of at

4    least $100, to begin 30 days after your release from

5    imprisonment, paid to the Clerk of the U.S. District Court,

6    Greenbelt.  There is a special assessment of $200 due and

7    payable at this time.

8              I don't know that there are any further conditions.

9              All right.  So those are the terms and conditions of

10   your supervised release, both standard and specific.  The court

11   imposes no fine in the case.  You are subject to custody.

12             You may appeal this decision in any way.  There

13   probably was a waiver of appeal.  I don't have the plea

14   agreement here, but I would certainly believe that you could

15   appeal and see what happens in that regard.  Whether the Court

16   of Appeals would determine that you've waived your right to

17   appeal is all, I think, open in the plea agreement.  I'm not

18   going to advise you as to that.  But you would have to note your

19   appeal within 14 days.  Mr. Basile can tell you more about that.

20             All right.  Is there anything more from the

21   prosecution, Ms. Wine?

22             MS. WINE:  Your Honor, I would only clarify on the

23   judgment that the $98,513 in restitution pertains to

24   Case 00-373.

25             THE COURT:  All right.  Let me make a note of that.

1    00-373.  All right, I'll put that down.

2            MS. WINE:  And Your Honor, I believe you already noted

3    that that's joint and several with the other co-defendants in

4    that case.

5            THE COURT:  Right.  Joint and several with the other...

6            COURTROOM CLERK:  And Your Honor, there are open counts

7    to be dismissed in both cases.  I believe it's Counts 2 through

8    4 in both 00-0373 and 00-0605.

9            THE COURT:  Okay.  Do you want to enter a *nolle prosse*

10   as to those, Ms. Wine?

11           MS. WINE:  Yes.  As to Counts 2, 3, and 4 in both

12   00-373 and 00-605, Your Honor.

13           THE COURT:  Were there in fact codefendants in this

14   case?

15           MS. WINE:  In the first case, 00-373, there were four

16   co-defendants, each of whom have already been convicted.  And in

17   the second case there are no co-defendants.

18           THE COURT:  All right.  The restitution, then, is only

19   as to the first case anyway.

20           MS. WINE:  Correct, Your Honor.

21           THE COURT:  That's why jointly and several was as to

22   the four codefendants.

23           MS. WINE:  Yes, Your Honor.

24           THE COURT:  All right.  Anything else from the

25   government, Ms. Wine?

1          MS. WINE:  No, Your Honor.  Thank you.

2          THE COURT:  From the defense, Mr. Basile?

3          MR. BASILE:  No, Your Honor.

4          THE COURT:  All right.  Thank you, ladies and

5    gentlemen.  Court is adjourned.

6          COURTROOM CLERK:  This honorable court stands in

7    recess.  Everyone please stay well.

8          (Off the record at 5:16 p.m.)

9

10

11

12

13

14

15

16          **CERTIFICATE OF OFFICIAL COURT REPORTER**

17

18          **I, Rebecca Stonestreet, certify that the foregoing is a**

19    **correct transcript from the record of proceedings in the**

20    **above-entitled matter.**

21

22

23    **____// Rebecca Stonestreet_**                    2/1/2021

24    **SIGNATURE OF COURT REPORTER**                    **DATE**

25

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*